**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10-cv-530 (RCL) |
| | ) | |
| KELLOGG BROWN & ROOT SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

In the midst of the Civil War, Congress passed the False Claims Act to stop the "plundering of the public treasury" that had resulted from the "frauds and corruptions practiced in obtaining pay from the Government during the present war." Act of Mar. 2, 1863, ch. 67, § 1, 12 Stat. 696; *United States v. McNinch*, 356 U.S. 595, 599 (1958); Cong. Globe, 37th Cong., 3d Sess. 955–56 (1863) (statement of Sen. Jacob M. Howard).[1] Invoking the twenty-first century iteration of the statute, 31 U.S.C. § 3729, the United States brings this action against Kellogg Brown & Root Services, Inc. ("KBR") to recover civil penalties and treble damages on more than $100 million in allegedly false claims arising from "the present war" in Iraq. The government also sues under breach of contract, unjust enrichment, and payment by mistake causes of action. KBR, citing a lack of clarity in the contract and its support for the military amid daunting security conditions in Iraq, moves to dismiss the complaint. For the reasons set forth below, that motion will be denied with respect to the False Claims Act and breach of contract counts and granted on the unjust enrichment and payment by mistake counts.

---

[1] For more on the history of the False Claims Act, see J. Randy Beck, *The False Claims Act and the English Eradication of* Qui Tam *Legislation*, 78 N.C. L. Rev. 539 (2000).

## II.    BACKGROUND

### A.    Factual History

#### 1.    The LOGCAP III Contract

On December 14, 2001, the Army awarded KBR a contract to provide logistical services such as "transportation, maintenance, facilities management, and dining facilities" in "support of military operations around the world."  Compl. ¶ 5, Apr. 1, 2010, ECF No. 1; *see* Def.'s Mot. Dismiss ["D.'s Mot."], Ex. 2, ECF No. 3-3 (reproducing contract) ["LOGCAP III"].  The contract, known as LOGCAP III—an acronym for the Army's Logistics Civil Augmentation Program—operates on an "indefinite delivery/indefinite quantity" basis.  Compl. ¶¶ 5–6.  In other words, the contract does not specify a fixed amount of work.  Rather, the government assigns tasks to KBR through a series of individual orders and then reimburses the contractor for the costs of performing each order, plus a one percent fee.  *Id.* ¶ 6.  KBR can also earn an award fee of up to two percent, based on the government's evaluation of its performance.  *Id.*  If KBR allocates work to a subcontractor, as it frequently does, KBR pays the subcontractor and then submits its costs to the government for reimbursement.  *Id.* ¶ 7; *see also United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373–74 (4th Cir. 2008) (explaining and interpreting the LOGCAP contract in a different dispute); *United States ex rel. McBride v. Halliburton Co.*, No. 05-828 (HHK), WL 1954441, at *1 (D.D.C. July 5, 2007) (same).

After the war in Iraq commenced in 2003, KBR received task orders to provide services to American troops deployed there.  Compl. ¶ 7; D.'s Mot. 17.  The government alleges that some of the claims KBR submitted based on task orders between 2003 and 2006 included false statements in violation of the False Claims Act ("FCA").  Specifically, the United States charges that KBR knowingly billed the government for the cost of private security contractors in Iraq, an

expense the government argues is forbidden by the contract and thus a false claim under the statute. 31 U.S.C. § 3729(a)(1); Compl. ¶ 34.

Several provisions of the LOGCAP III contract are directly relevant to this allegation. All are drawn from "Section H, Special Contract Requirements," which "addresses the deployment of contractor personnel into a theater of operations in support of a contingency or exercise." LOGCAP III, § H, at 96. The contract notes that the guidance in this section "is not all-inclusive nor are all items required for all situations . . . . Each contingency will evolve differently depending upon theatre commander's guidance impacting on the deployment. *Id.*

Clause H-16, titled "Force Protection," provides:

> While performing duties [in accordance with] the terms and conditions of the contract, the Service Theater Commander will provide force protection to contractor employees commensurate with that given to Service/Agency (e.g. Army, Navy, Air Force, Marine, [Defense Logistics Agency]) civilians in the operations area unless otherwise stated in each task order.

*Id.* ¶ H-16, at 98.

Clause H-21, titled "Weapons and Training," provides, in relevant part:

> Whether contractor personnel will be permitted to carry a government furnished weapon for self-defense purposes in the Area of Operations (AO) is at the discretion of the Theater Commander. However, contractor personnel will not possess personally owned firearms in the AO. The government may at its discretion issue weapons and ammunition (M9 Pistols) for self-defense to the contractor employees. . . . The contractor shall ensure that its employees adhere to all guidance and orders issued by the Theater Commander or his/her representative regarding possession, use, safety, and accountability of weapons and ammunition.

*Id.* ¶ H-21, at 101.

Clause H-13, titled "Management," provides, in relevant part:

> The contractor shall ensure that all personnel hired by or for the contractor will comply with all guidance, instructions, and general orders applicable to U.S. Armed Forces and DoD civilians as issued by the Theater Commander or his/her representative. This will include any and all guidance and instructions issued based upon the need to ensure mission accomplishment, force protection, and safety, unless directed otherwise in the task order . . . . The contractor shall comply, and shall ensure that all deployed employees, subcontractors, subcontractors employees, invitees, and agents comply with pertinent Service and Department of Defense directives, policies, and procedures, as well as federal statutes, judicial interpretations and international agreements . . . applicable to U.S. Armed Forces or U.S. citizens in the area of operations.

*Id.* ¶ H-13, at 96.

The government argues that this clause incorporates U.S. Central Command ("CENTCOM") General Order No. 1A, issued in December 2000, and CENTCOM General Order No. 1B, issued in March 2006. Compl. ¶¶ 14, 17; D.'s Mot., Exs. 20 & 21, ECF No. 3-21 ["Gen. Ord. 1A"] & ECF No. 3-22 ["Gen. Ord. 1B"]. These orders apply to "civilians serving with, employed by, or accompanying the Armed Forces of the United States," Gen. Ord. 1A, at 1; Gen. Ord. 1B, at 1, and prohibit the "purchase, possession, use or sale of privately owned firearms, ammunition, explosives, or the introduction of these items into" CENTCOM's area of responsibility, which includes Iraq. Gen. Ord. 1A, ¶ 2(a); Gen. Ord. 1B, ¶ 2(a).

In November 2005, KBR and the Army revised the LOGCAP III contract to incorporate Defense Federal Acquisition Regulation Supplement ("DFARS") § 252.225-7040 (June 6, 2005). Compl. ¶ 18; D.'s Mot., Ex. 25, Nov. 2, 2005, ECF No. 3-26 ["Mod. 12"]. The amendment, labeled Modification 00012, reiterates KBR's responsibility to comply with all applicable "United States regulations, directives, instructions, policies, and procedures," Mod. 12 at ¶ I-6(c)(3)(d)(3), and "orders, directives, and instructions issued by the Combatant Commander related to force protection, security, health, [and] safety . . . ." *Id.* at ¶ I-6(c)(3)(d)(4). The

modification also provides: "If the Contractor requests that its personnel performing in the theater of operations be authorized to carry weapons, the request shall be made through the Contracting Officer to the Combatant Commander. The Combatant Commander will determine whether to authorize in-theater contractor personnel to carry weapons and what weapons will be allowed." *Id.*

## 2. *Related Regulations*

In addition to the LOGCAP III contract, CENTCOM General Orders, and contract modification described above, several related regulations are relevant to this case.

The Coalition Provisional Authority ("CPA"), which was the official governing authority of Iraq from the fall of Saddam Hussein's regime in April 2003 to the return of sovereignty to the new Iraqi government in June 2004, Compl. ¶ 20 n.1, issued Order No. 3: Weapons Control on December 31, 2003. Compl. ¶ 20; D.'s Mot., Ex. 22, Dec. 31, 2003, ECF No. 3-23 ["CPA Order 3"]. Section 3 of the Order, titled "Authorized Possession and Use of Firearms and Military Weapons," provides that "[g]roups and individuals who have been authorized to carry weapons in the course of their duties by the CPA or Commander, Coalition Forces or their duly authorized delegates" are authorized to "possess and use issued Firearms and Military Weapons, including Special Category Weapons." CPA Order 3, § 3, ¶ 1(c). The Order also provides that "[p]rivate security firms may be licensed by the Ministry of the Interior to carry weapons and use licensed Firearms and Military Weapons, excluding Special Category Weapons, in the course of their duties, including in public places," *id.* ¶ 2, and that "[i]ndividuals not otherwise authorized to possess or use Firearms or Military Weapons by this or any other CPA instrument may apply for weapons authorization" through a licensing system "administered by the Ministry of Interior." *Id.* § 5.

On June 26, 2004, the CPA issued Memorandum Number 17: Registration Requirements for Private Security Companies (PSC) to "provide[] guidance for PSC that intend to operate within Iraq." Compl. ¶ 20; D.'s Mot., Ex. 23, § 1, June 26, 2004, ECF No. 3-24 ["CPA Mem. 17"]. The memorandum requires private security contractors to obtain a business license and an operating license or a temporary operating license from the Iraqi Ministry of Interior. *Id*. § 2. "Where an Operating License is granted . . . , the MOI shall issue Weapons Cards to those PSC employees who will bear arms as part of their duties. Such Weapons Card shall constitute a license to possess and use firearms." *Id*. §6, ¶ 1.

In December 2005, CENTCOM issued a "Policy and Delegation of Authority for Personal Protection and Contract Security Service Arming of DoD Civilian Person[nel]." D.'s Mot., Ex. 24, Dec. 23, 2005, ECF No. 3-25. The message provided that, "Within Iraq, the use of properly licensed PSC under CPA Memorandum 17 . . . is permitted to protect civilians, contractors, non-military facilities and equipment," as well as "to protect static military facilities and any military personnel and equipment within that facility. *Id.* ¶ 2.C.2.A–B. CENTCOM broadened the policy the next year to include protection of "military personnel and military equipment outside of static facilities (such as for personal security details and convoys) when risk of direct contact with uniformed enemy is not probable." D.'s Mot., Ex. 26, ¶ 2.C.2.B, Nov. 7, 2006, ECF No. 3-27.

### 3. *Claims Submitted by KBR Involving Private Security in Iraq*

The contract provisions and regulations above form the backdrop for the issue at the center of this case—KBR's claims for reimbursement of expenses involving private security contractors. There is no dispute that KBR subcontractors employed private security contractors, or that KBR submitted claims to the government requesting reimbursement of those expenses.

D.'s Mot. 22; *Id.*, Ex. 13, ¶ 1, Apr. 24, 2008, ECF No. 3-14 ["KBR's ASBCA Compl."]

(acknowledging "the use by KBR's LOGCAP III subcontractors of armed private force

protection" while arguing that this use was "well known to the Army").  The question, rather, is

whether KBR's submission of these claims constitutes a False Claims Act violation or supports

the government's allegations of breach of contract, unjust enrichment, and payment by mistake.

### B.    Procedural History

In February 2007, the Defense Contract Audit Agency ("DCAA") notified KBR that it

was disallowing approximately $19.6 million in reimbursement payments stemming from the use

of armed private security by one of KBR's subcontractors, ESS Support Services Worldwide

("ESS").  *Id.* ¶ 47; D.'s Mot. 20.  The government explained that these expenses were not

allowable under Clause H-16 of the LOGCAP III contract, which provides that the military is

responsible for supplying force protection to civilian contractors in war zones.  D.'s Mot. 21.

Ultimately, the government identified more than $100 million in payments related to private

security that it deemed improper.  D's Mot. 22; United States' Opp'n KBR's Mot. Dismiss 18,

June 25, 2010, ECF. No. 9 ["U.S. Opp'n"].

KBR challenged the denial of payment by filing a certified claim under the Contract

Disputes Act ("CDA").  D's Mot. 22.  The contracting officer did not issue a final decision on

the claim, which constitutes a "deemed denial" under the CDA.  *Id.*  KBR then appealed to the

Armed Services Board of Contract Appeals ("ASBCA"), contending that nothing in the

LOGCAP III contract prohibits the use of private security contractors and that the Army had

previously paid claims that it knew included private security expenses.  *Id.* at 21–22.  The

government responded by reasserting that Clause H-16 assigned the military exclusive

responsibility for providing security and argued that Clauses H-13 and H-21 barred civilian

contractors in Iraq from carrying weapons, thus rendering the private security expenses in violation of the contract. *Id.* at 22.

On April 1, 2010, the United States filed suit in this Court.[2] Compl. The government alleges that KBR violated the FCA when it "hired private armed security contractors Triple Canopy, Omega Risk Solutions, and Al Dhahir to provide personal security details for its executives in Iraq . . . used four of its own employees as armed security for executives . . . [and] billed the dominant portion of the costs attributable to those services to the Army indirectly through an overhead account." *Id.* ¶ 22. The government additionally alleges that "more than 30 of KBR's other subcontractors used private armed security in Iraq without required authorization," *id.* ¶ 23, including ESS, which "incurred significant costs for unauthorized private armed security costs, which KBR passed on to the Army, plus associated fees, under LOGCAP III." *Id.* ¶ 24.

The government claims that "KBR knew and understood that the use of private security without authorization by the US CENTCOM Commander . . . without approval by the contracting [officer] . . . and without the companies being licensed and registered by the Iraqi Ministry of the Interior, was prohibited under LOGCAP III and other authorities incorporated into the contract by reference." *Id.* ¶ 25. As evidence that KBR "knew that any claims for such costs would be false," *id.*, the government cites internal KBR e-mails apparently acknowledging that subcontractors' use of private security details "could be considered unallowable . . . as the government has the responsibility to provide force protection," *id.* ¶ 29, and suggesting that "KBR should not hire subcontractors who used private security because 'it will effect a material change in [the] contract.'" *Id.* ¶ 30. The government also alleges that "the Army and KBR

[2] When it filed suit in this Court, the government moved to stay the proceedings in the ASBCA pending a resolution to its False Claims Act action here. That motion was denied by the ASBCA. *Kellogg Brown & Root Services, Inc.*, ASBCA Nos. 56358, 57151, 2011-1 BCA ¶ 34,614. The parties continue to litigate KBR's appeal in that court.

discussed modifying LOGCAP III to allow the use of private armed security," but that the modification was "never executed." *Id.* ¶ 32. These discussions, the government claims, "demonstrate that KBR knew and understood that . . . without such a modification, KBR could not charge the Army for the costs of private armed security services." *Id.* In the government's view, the fact that KBR submitted the claims for repayment notwithstanding this knowledge violates the FCA. *Id.* ¶ 34 (citing 31 U.S.C. § 3729(a)(1)).

Just over two months after the filing of the complaint, KBR moved to dismiss. D.'s Mot. 1. KBR contends that the government has not pled its fraud allegations with the particularity demanded by Federal Rule of Civil Procedure 9(b), *id.*, at 12; that the complaint fails to state a cognizable legal claim and thus cannot survive a motion to dismiss under Rule 12(b)(6), *id.* at 11–12; and that this Court should dismiss the breach of contract count under Rule 12(b)(1) because that claim is properly adjudicated in the ASBCA, *id.* at 13. The government filed its opposition to KBR's motion in June, U.S. Opp'n; KBR replied in July, D.'s Reply, July 12, 2010, ECF No. 12 ["D.'s Reply"]; and the parties engaged in several months of motions practice. Among the numerous filings was a motion for partial summary judgment on liability by the government. United States' Mot. Partial Summ. J., Oct. 14, 2010, ECF No. 32. On April 25, 2011, Judge Roberts issued an order resolving or setting aside all other motions—including the partial summary judgment motion— until the Court ruled on the motion to dismiss, "which has the potential to dispose of all the claims in the complaint." Minute Order, Apr. 25, 2011, ECF No. 51. The Court now turns to that task.[3]

## III.    LEGAL STANDARD

### A.    Rule 9(b)

---

[3] On May 5, 2011, the case was transferred by consent from Judge Roberts to Chief Judge Lamberth. Reassignment of Civil Case, May 5, 2011, ECF No. 52.

Federal Rule of Civil Procedure 9(b) requires that a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  As this Court has explained, "[t]he purpose of Rule 9(b) is to ensure that defendants have sufficient notice of the claims against them to prepare a defense."  *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 18 (D.D.C. 2003).   This means that "the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting *United States v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)).   Although this constitutes a "heightened pleading standard . . . Rule 9(b) is still subject to the general 'short and plain statement' command set out in Rule 8."  *United States ex rel. Brown v. Aramark Corp.*, 591 F. Supp. 2d 68, 72 (D.D.C. 2008).  Thus, while Rule 9(b) "requires more particularity than Rule 8," it "does not completely vitiate the liberality of Rule 8."  *Ortega*, 240 F. Supp. 2d at 18.

**B.     Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  To satisfy this test, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal*, 16 F.3d

at 1276.  However, a court may not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  In other words, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.*

### C.     Rule 12(b)(1)

Federal district courts are courts of limited jurisdiction, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994), and a Rule 12(b)(1) motion for dismissal presents a threshold challenge to a court's jurisdiction.  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  In evaluating such a motion, the Court must "accept as true all of the factual allegations contained in the complaint." *Wilson v. District of Columbia*, 269 F.R.D. 8, 11 (D.D.C. 2010) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)), but it may also consider relevant materials outside the pleadings.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).  The Court must remain cognizant that "the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Wilson*, 269 F.R.D. at 11 (quotations omitted).  In defending against a Rule 12(b)(1) motion, the plaintiff bears the burden of showing that jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).

## IV.    ANALYSIS

### A.     False Claims Act Allegations

The False Claims Act provides that "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the government sustains because of the act of that person."

31 U.S.C. § 3729(a)(1). As both parties correctly state, a sufficient FCA complaint must allege

that the "(1) defendant submitted a claim to the government; (2) which was false; and (3) which

the defendant knew was false." D.'s Mot. 27; U.S. Opp'n 20 (quoting *United States ex rel.*

*Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 57 (D.D.C. 2007) (internal

citation and quotation marks omitted)). The FCA defines "knowingly" as a situation in which

the defendant "has actual knowledge of the information . . . acts in deliberate ignorance of the

truth or falsity of the information . . . or . . . acts in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b)(1)(A). Importantly, the FCA provides that demonstrating a

violation "requires no proof of specific intent to defraud." *Id.* § (b)(1)(B).

Here there is no dispute about prong (1). KBR submitted numerous claims to the Army

seeking reimbursement of the expenses. KBR's ASBCA Compl. ¶ 1. The government argues

that prong (2) is satisfied because the claims were false in that they included private security

expenses not allowed under the LOGCAP III contract. U.S. Opp'n 9. The government contends,

based in part on internal KBR e-mails, that the complaint meets the requirement of prong (3)

because KBR knew that the expenses for private security were not allowed by the contract.

Compl. ¶¶ 25–35. The Court addresses KBR's responses in turn.

### 1. *KBR's Motion to Dismiss Based on Rule 9(b)*

As a threshold matter, KBR argues that the government has failed to plead "with

particularity the circumstances constituting fraud" in accordance with Rule 9(b). D.'s Mot. 34

(quoting Fed. R. Civ. P. 9(b)). KBR accurately notes that the Rule 9(b) standard applies to FCA

claims. *Id.* (citing *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C.

Cir. 2002)). As noted above, an FCA plaintiff "must state the time, place and content of the false

misrepresentations, the fact misrepresented and what was retained or given up as a consequence

of the fraud." *Kowal*, 16 F.3d at 1278.  Put more colloquially, an FCA plaintiff must identify the "who, what, when, where, and how of the alleged fraud."  *Wilson*, 525 F.3d at 379 (internal quotation marks and citation omitted).

The government meets that test.  The complaint adequately alleges the "who" (KBR, Compl. ¶ 4), the "what" (claims for expenses based on private security, *id.* ¶ 12), the "when" (between 2003 and 2006, *id.* ¶ 7), the "where" (in Iraq, *id.*), and the "how" (by submitting claims for expenses it knew were prohibited by the contract, *id.* ¶¶ 22–32) of the alleged fraud.  The government specifically alleges that KBR "awarded subcontracts to three companies solely for the purpose of providing private security to its executives and other personnel," *id.* ¶ 26, "armed four of its own employees," *id.*, and "awarded subcontracts to more than 30 companies that used private armed security in connection with performing dining facilities management and other services," *id.* ¶ 27, all without obtaining the approval required by the contract.  *Id.* ¶¶ 26–27. The complaint also excerpts quotations from internal KBR e-mails that substantiate the allegation that KBR submitted the claims knowing that they were not allowed by the contract. *Id.* ¶¶ 28–32.

While the government conceivably could have provided additional details—such as individual claim numbers or the specific submissions that are allegedly false—the same could be said of virtually every complaint, particularly those based on multiple claims and lengthy, complex government contracts.  What matters here is that the complaint fulfills Rule 9(b)'s underlying purpose of providing KBR with "sufficient notice of the claims against [it] to prepare a defense," *Ortega*, 240 F. Supp. 2d at 18, especially given that KBR presumably has access to the claims it submitted.  "The D.C. Circuit has taken a generous approach to pleadings" in the FCA context, finding that "a complaint is not deficient even if it fails to set out a prima facie case

as an initial matter." *Id.* (citing *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113–14 (D.C. Cir. 2000)). The Fourth Circuit has likewise "counseled [that] in the context of the FCA, 'A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). The Court here is satisfied that the government has presented enough of a case to enable KBR to prepare a defense based on the evidence that it possesses and may seek from the government through the discovery process. The argument that the complaint should be dismissed based on Rule 9(b) is therefore rejected.

### 2. *KBR's Motion to Dismiss Based on Rule 12(b)(6)*

KBR also moves to dismiss the FCA allegations for failure to state a claim under Rule 12(b)(6). D.'s Mot. 20. A successful FCA claim generally occurs in one of three forms. *See Hockett*, 498 F. Supp. 2d at 64. The first and most obvious form—"the paradigmatic case," as the D.C. Circuit has called it—is the "factually false" claim, in which a contractor or other claimant submits information that is untrue on its face. *United States v. Sci. Applications Int'l Corp. (SAIC II),* 626 F.3d 1257, 1266 (D.C. Cir. 2010). For example, a factually false claim may include "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). The FCA reaches beyond "factually false" claims to encompass two types of "legally false" claims. *Id.* These claims do not involve information that is false on its own terms, but instead "rest[] on a false representation of compliance with an applicable federal statute, federal

regulation, or contractual term." *Id.*; *see also Harrison*, 176 F.3d at 786 (collecting cases involving legally false claims).

A legally false claim, also known as a "false certification," can be either "express" or "implied." *SAIC II*, 626 F.3d at 1266. An express false certification occurs when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied. *Mikes*, 274 F.3d at 698. For example, a law student who submits an essay signed, "This is my own work," would be guilty of an *express* false certification if the essay had actually been lifted from an online source. By contrast, an *implied* false certification occurs when the claimant makes no affirmative representation but fails to comply with a contractual or regulatory provision "where certification was a prerequisite to the government action sought." *SAIC II*, 626 F.3d at 1266 (quoting *United States ex. rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C. Cir. 2000)). To return to our misguided law student, he would commit an implied false certification by turning in a plagiarized essay—even without testifying to its authenticity—if a law school guideline requiring that "All submissions must be your own work," was a prerequisite for submitting work in the course.

### a. Factual Falsity

Somewhat surprisingly, the government argues initially that the KBR claims at issue here fall into the first category of "factually false" claims. U.S. Opp'n 9. Unlike a typical FCA plaintiff alleging factual falsity, the government does not suggest that KBR sought reimbursement for work it did not perform or mischaracterized the services it provided— disguising private security expenses as dining facilities expenses, for example. There is no dispute about the number, amount, or factual accuracy of the submitted claims. Rather, the government asserts that "KBR is liable under the FCA for submitting claims for costs that it

knew were not allowed under or even within the scope of the contract at issue." *Id.* In other words, under the government's theory, the claims are "false" precisely because they are "disallowed" by the contract. *Id.* at 13. The government cites no case providing direct support for this interpretation of factual falsity.[4] The reason for the lack of authority is clear: determining the scope of a contract is a quintessentially *legal*, not *factual*, question.

To some degree this distinction is an exercise in semantics, but it could have serious repercussions given the legal context. If "not allowable under contract" can be substituted directly for "false," the difference between a breach of contract claim and an FCA claim could evaporate. Courts have consistently held that the FCA does not have this effect. As Judge Wilkinson explained in *Wilson*, "If every dispute involving contractual performance were to be transformed into a[n] . . . FCA suit, the prospect of litigation in government contracting would literally have no end." *Wilson,* 525 F.3d at 373. The FCA "surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood." *Id.* at 378. To blur the distinction between fraud and breach of contract, then, is to contradict the purpose of the statute. "Allowing [the FCA] to be used in run-of-the-mill contract disagreements . . . would burden, not help, the contracting process, thereby driving up costs for the government and, by extension, the American public." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Constr. Co.*, 612 F.3d 724, 726–27 (4th Cir. 2010) (Wilkinson, J.).

### b. Implied False Certification

---

[4] The government refers to two cases during its discussion of its factual falsity theory. One is *Hockett*, in which this Court held that certain Medicare claims were *not* factually false because they did not contain factual inaccuracies such as "misstat[ing]the services actually rendered" or "over-reporting the number of patients . . . treated or the length of their stays." *Hockett*, 498 F. Supp. 2d at 64. The other is an unreported 1994 opinion from the Northern District of Iowa, *United States v. Vector Corp.*, No. 93-48, 1994 U.S. Dist. LEXIS 21330 (N.D. Iowa Apr. 14, 1994), which explains that a company that mislabeled an "expense as a direct expense knowing it not to be a direct expense and further mislead the government as to the services being supplied . . . would qualify as [submitting] a fraudulent claim." *Id.* at *10. But the court never specified that this would be considered a "factually false" claim, as distinguished from a legally false claim. Furthermore, the unreported opinion from a fellow district court in a different jurisdiction lacks controlling authority here.

While the United States' contention that KBR's claims are factually false is unavailing, the government argues alternatively that KBR violated the FCA by making a legally false claim—an implied false certification. U.S. Opp'n 22. KBR suggests that the United States has waived this argument, D.'s Reply 7, but that is plainly incorrect because the government explicitly advocates it in opposing the motion to dismiss. U.S. Opp'n 22. Specifically, the government argues that KBR impliedly falsely certified that its claims for reimbursement complied with the terms of the LOGCAP III contract, which, in the government's view, prohibited expenses for private security. *Id.* at 23. As explained above, the scope of the contract is primarily a legal question, so the government's FCA allegation is properly framed in terms of legal falsity.

To prevail on this type of claim, the government must show not only that a defendant knowingly made an impliedly false certification but also that the "certification was a prerequisite to the government action sought." *Siewick*, 214 F.3d at 1376. This is common sense. If a contractor violates an obscure statutory provision or minor contractual term while submitting a claim based on unrelated activities, it should not face the severe penalties of the FCA for merely tangential violations. This was the position taken by the D.C. Circuit in *Siewick*, in which the court found that a government contractor submitting claims arising from an infrared sensor technology contract was not liable under the False Claims Act even if it had violated a separate, unrelated ethics statute aimed at curbing revolving door abuses by former government employees. *Siewick*, 214 F.3d at 1374–76; *cf. United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019–20 (7th Cir. 1999) (explaining that the "FCA is not an appropriate vehicle for policing technical compliance with administrative regulations"); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997) (noting the

court's holding that "the FCA is not an enforcement device for the Anti-Pinkerton Act"); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (holding that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA"). This understanding is consistent with the longstanding and broadly accepted principle that a plaintiff making a tort claim based on a statutory violation must have suffered an injury *of the type the statute was designed to prevent*.[5] Thus, the "FCA does not provide a remedy for every violation of a statute or regulation," *Ortega*, 240 F. Supp. 2d at 19, and there is "no liability under [the FCA] for a false statement unless it is used to get a false claim paid." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (en banc).

KBR contends that, even if it violated the various contractual provisions the government asserts it did, these violations are akin to the ones discussed above in that they are not prerequisites for payment under the contract. In other words, KBR argues that LOGCAP III does not condition the government's payment of KBR's reimbursement claims on Clause H-16 (requiring the military to provide force protection to contractor employees), Clause H-21 (giving the theater commander discretion to determine whether contractors can carry government-furnished weapons for self-defense), Clause H-13 (allegedly incorporating the CENTCOM General Orders prohibiting the private possession of firearms), Modification 12 (requiring contractor personnel seeking to carry weapons to make the request to the combatant commander), or CPA Order 3 and Memorandum 17 (requiring contractors to obtain a license from the Iraqi Ministry of Interior). D.'s Mot. 31–35. Because the complaint alleges "at best . . .

---

[5] For the classic illustration of this concept, see *Gorris v. Scott*, 9 L.R. Ex. 125 (1874), in which the English court denied recovery to owners of sheep swept overboard in a storm because the purpose of the statute requiring pens on the ship was to prevent disease, not to protect against drowning. *See also Abrahams v. Young & Rubicam Inc*., 79 F.3d 234, 237 (2d Cir. 1996) ("In a 'suit on a statute'—that is, a suit in which the statute itself grants the recovery, creates the jurisdiction, or permits special damages—the plaintiff must show both that he is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent." (citing *Gorris*)).

that KBR or its subcontractors may have violated technical regulations related to the use of weapons in Iraq," KBR argues that the government fails to show that it certified compliance with any condition of the contract that was a "prerequisite" for payment and thus cannot state an FCA violation. *Id.* at 34. The government disagrees, arguing that the contractual and regulatory provisions listed above are in fact prerequisites for payment under LOGCAP III. U.S. Opp'n 23.

What exactly constitutes a sufficient "prerequisite" to establish an implied false certification claim is a question that has, until recently, remained somewhat uncertain in the D.C. Circuit. At the time the parties submitted their motions, the controlling circuit precedent appeared to be *Siewick*, which provided that "a false certification of compliance with a statute or regulation cannot serve as the basis for [an FCA violation] *unless payment is conditioned on that certification.*" *Siewick*, 214 F.3d at 1376 (emphasis added). *Siewick* left open the question of whether this "conditioning" had to be explicit—in other words, whether an FCA plaintiff could recover *only if* the contract or regulation stated directly that, "payment is contingent upon compliance this provision." The Second Circuit answered in the affirmative, holding that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly states the provider must comply in order to be paid.*" *Mikes*, 274 F.3d at 700 (emphasis added); *see also United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 114 (2d Cir. 2010) ("An *implied* false certification takes place where a statute *expressly* conditions payment on compliance with a given statute or regulation, and the contractor, while failing to comply with the statute or regulation (and while knowing that compliance is required), submits a claim for payment." (second emphasis added)).[6]

---

[6] The use of the term "express" may be somewhat confusing given that FCA doctrine also includes the "express false certification claims" discussed earlier. That concept, which involves the submission of claims that expressly testify to a false statement (recall the law student falsely affirming, "This is my own work") is distinct from this one,

Applying this rule, KBR's argument would likely prevail. Nothing in the contractual or regulatory provisions cited by the government *expressly* conditions payment of LOGCAP III claims on compliance with those provisions. D.'s Mot. at 32–33 (analyzing provisions one-by-one and showing that none condition payment on compliance). In December 2010, however, the Court of Appeals for the D.C. Circuit outlined a different standard to govern implied certification cases like this one. In *SAIC II*, the court considered "whether an FCA plaintiff may state a cause of action against a federal contractor who fails to disclose the violation of a contractual condition that is . . . not an express prerequisite to payment." *SAIC II*, 626 F.3d at 1267–68. Finding itself "untethered by precedent" on the question, a panel of Chief Judge Sentelle, Judge Tatel, and Judge Griffith unanimously rejected the "express conditioning" requirement set out in the Second Circuit cases. *Id.* at 1268. Judge Tatel explained for the panel that "nothing in the statute's language specifically requires such a rule, and we fear that adopting one would foreclose FCA liability in situations that Congress intended to fall within the Act's scope." *Id.* Instead, the court held that, "[t]he existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not . . . a necessary condition. The plaintiff may establish materiality in other ways, such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue." *Id.* at 1269.

The holding in *SAIC II* controls this case.[7] Rather than having to show that KBR violated provisions of the LOGCAP III contract that expressly conditioned payment on

---

which requires a contract to expressly condition payment on compliance with a condition in order for an FCA plaintiff to raise an implied false certification claim.

[7] While the motion to dismiss, opposition, and reply were filed before the decision in *SAIC II*, the parties have had nearly nine months to supplement their filings with analysis of the case. Neither has done so (although they did reference the case in filings related to the government's motion for partial summary judgment). More importantly, after careful study of *SAIC II* and the facts of this case, the Court has concluded that the government has

compliance, the government need only show that "the contractor withheld information about its noncompliance with material contractual requirements." *Id.* This is still a difficult bar to clear. The Court of Appeals warned that "the implied certification theory is prone to abuse by the government and [other plaintiffs] who, seeking to take advantage of the FCA's generous remedial scheme, may attempt to turn the violation of minor contractual provisions into an FCA action." *Id.* at 1270. That is exactly the objection that KBR raises in this case. As the court explained, "this very real concern can be effectively addressed through strict enforcement of the [FCA]'s materiality and scienter requirements." *Id.* The Court addresses each of those requirements in turn.

i. *Materiality*

The materiality prong requires the government to "prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay." *Id.* at 1271. As the Tenth Circuit explained in a case employing "the same materiality approach" as *SAIC II*, *id.*, this inquiry requires "analysis focus[ing] on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168–69 (10th Cir. 2010) (quoting *United States ex rel. Conner v. Salina Reg'l Health Cent., Inc.*, 543 F.3d 1211, 1218 (10th Cir. 2008)). Put another way, the government must show that had it "known of the falsity [of the claims submitted], it may not have paid." *Id.* at 1169.

The government makes this exact argument when it states that "[o]bviously this information [about KBR's potential violation of the contract provisions related to private

---

demonstrated enough to survive the motion to dismiss for the reasons outlined in this portion of the opinion. The most appropriate step, then, is to deny the motion and move forward with the case.

security] was critical to the Army's decision to pay because the contract did not permit payment for unallowable costs."  U.S. Opp'n 23.  The internal e-mails quoted in the complaint, Compl. ¶¶ 28–31, reinforce this point by suggesting that KBR recognized that the provisions were material when its employees wrote that the "cost [of private security] could be considered unallowable." *Id.* ¶ 28.  This is precisely the kind of "testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue" that *SAIC II* allows an FCA plaintiff to present.  *SAIC II*, 626 F.3d at 1269.

Of course, KBR can continue to press its contentions that (1) the LOGCAP III contract does not prohibit reimbursement for private security contractor expenses, and (2) even if it does, none of the provisions violated by KBR are material to payment for its claims.  If KBR can prevail on either of these lines of argument, it can likely avoid FCA liability.  *Id.* at 1271 ("Payment requests by a contractor who has violated minor contractual provisions that are merely ancillary to the parties' bargain are neither false nor fraudulent.")  At this stage of the proceedings, however, the government has stated enough to draw the inference that the provisions in question are material to the government's decision to pay.  "So long as the pleadings suggest a plausible scenario to show that the pleader is entitled to relief, a court may not dismiss." *Atherton,* 567 F.3d at 681.

### ii.  Scienter

Similar analysis applies to the scienter requirement.  Under *SAIC II*, a successful FCA plaintiff must "prove that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *SAIC II*, 626 F.3d at 1271.  The e-mails cited in the complaint suggest that KBR knew both that private security costs "could be considered unallowable" and could "effect a material change in

[the] contract." Compl. ¶¶ 28, 30. The allegation that KBR tried to modify the contract to allow for the use of private armed security but continued to submit claims involving private security even after negotiations to amend the contract failed further supports the government's scienter argument. Compl. ¶ 32.

KBR counters that the scienter requirement cannot be met if the Court finds that KBR and the government had a reasonable disagreement about how to interpret the contract. D.'s Mot. at 23. This argument is persuasive. *See Siewick*, 214 F.3d at 1378; *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996) (holding that "a disputed legal issue . . . is not enough to support a reasonable inference that the allocation was *false* within the meaning of the False Claims Act"). Given the allegations the government has put forward, however, further factual material is required before the Court can determine whether the claims at issue here involved only a contractual dispute.

KBR also challenges the government's scienter argument on the grounds that the Army has paid claims in the past even when it knew that they contained private security expenses. KBR's ASBCA Compl. ¶ 1. If this were true, it would cut strongly in KBR's favor. While "government knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action . . . there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000). The government, however, alleges the exact opposite position by contending that it rejected the claims as soon as it recognized that they contained unallowable private security costs. U.S. Opp'n 23. Faced with competing factual claims, neither inherently more credible than the other, the Court must draw the inferences in the non-moving

party's favor. Here, that requires denying KBR's motion to dismiss. *See Atherton,* 567 F.3d at 681.

### B.     Breach of Contract Claim

Having denied KBR's motion to dismiss the FCA claim, on which the parties spent the vast majority of their arguments, the Court can address the other claims relatively simply. KBR moves to dismiss the government's breach of contract claim based on lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Its only argument, however, is based on the premise that the FCA claim would also be dismissed, in which case the breach claim would have to be adjudicated before the ASBCA in accordance with the Contract Disputes Act, 41 U.S.C. §§ 601, *et seq.* D.'s Mot. 52. Because the FCA claim was not dismissed, however, the breach claim must remain in this Court as well. As KBR acknowledges, the CDA jurisdictional limits contain an explicit exception for "any claim involving fraud." *Id.* § 605(a). While there might have been some question about the reach of the phrase "involving fraud" if the FCA claim had been dismissed, *see* U.S. Opp'n 40–41, there can be no doubt that a pending False Claims Act claim "involves" fraud. KBR's motion to dismiss the breach of contract claim for lack of jurisdiction is therefore denied.

### C.     Unjust Enrichment and Payment by Mistake Claims

Finally, KBR moves to dismiss the government's unjust enrichment and payment by mistake claims because quasi-contractual remedies like these are inapposite when an express contract governs interaction between two parties. D.'s Mot. 50–51. This is correct. As the D.C. Circuit has explained, "there can be no claim for unjust enrichment when an express contract exists between the parties." *Albrecht v. Comm. on Employee Benefits of the Fed. Reserve Employee Benefits Sys.,* 357 F.3d 62, 69 (D.C. Cir. 2004). The same goes for a payment by

mistake claim, another quasi-contractual remedy, because the existence of a valid contract

between the parties negates the need for the court to imply a contract by law.  *See Bloomgarden*

*v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973) ("There is, of course, no need to resort to quasi-

contract when the evidence sustains the existence of a true contract, either express or implied in

fact."); *United States v. Sci. Applications Int'l Corp. (SAIC I)*, 555 F. Supp. 2d 40, 59–60

(D.D.C. 2008) (applying this principle to both unjust enrichment and payment by mistake

claims).

The government does not dispute this "foundational principle of contract law," *Sununu v.*

*Philippine Airlines, Inc. (Sununu II)*, No. 98-1192 (RCL), 2011 WL 2438356, at *12 (D.D.C.

June 20, 2011), but instead emphasizes that the Federal Rules allow for pleading in the

alternative.  U.S. Opp'n 38–40.  As was the case in *SAIC I*, "[t]he government is correct, but its

point is unavailing."  *SAIC I*, 555 F. Supp. 2d at 59.  The liberal pleading approach of the Federal

Rules allows a plaintiff to plead alternative claims, but those claims must have some basis on

which relief could be granted or they will be vulnerable to a motion to dismiss under Rule

12(b)(6).  Here, the unjust enrichment and payment by mistake claims must be supported by, at

the very least, an allegation that there is no valid contract.  But the government makes no such

claim.  Indeed, throughout the extensive briefing each party has prepared in this case, there is no

suggestion that the LOGCAP III contract is invalid or inapplicable to the dispute at hand.  The

Court therefore finds that an express contract is present, and the quasi-contractual claims must be

dismissed.  *Cf. United States ex rel. Purcell v. MWI Corp.,* 254 F. Supp. 2d 69, 79 (D.D.C.

2003), (explaining that "courts . . . have granted motions to dismiss an unjust-enrichment claim

in light of the existence of an express contract"); *SAIC I*, 555 F. Supp. 2d at 59 (applying the

same reasoning to a payment by mistake claim).

**V.     CONCLUSION**

For the reasons outlined above, KBR's motion to dismiss is denied with respect to the False Claims Act and breach of contract counts and granted with respect to the unjust enrichment and payment by mistake counts.  The case will now proceed to discovery, where the parties will seek to clarify which provisions of the LOGCAP III contract, if any, prohibit expenses for private security contractors in Iraq; the materiality of those provisions to payment for KBR's claims; and the extent of KBR's knowledge about the legality of the claims it submitted.  As noted at the outset, the FCA was enacted against the backdrop of the "sordid picture" of Civil War contractors defrauding the government.  *McNinch*, 356 U.S. at 599.  The law was not intended and should not be invoked to punish companies for mere breaches of contract or good faith misunderstandings.  Yet there can be no excuse for a contractor that knowingly submits false claims or leads to the government being "generally robbed in purchasing the necessities of war."  *Id.*

A separate Order consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on August 3, 2011.